Peterson v. XPO Logistics. Good morning, Your Honors. Good morning. Counsel, may it please the Court, John Robinson for the appellant, Aaron Peterson. I'm going to attempt to reserve three minutes for rebuttal. This case, Your Honor, is about the scope of the litigation privilege, which is also known as the judicial proceedings privilege in Utah. And specifically, it's about whether the privilege is so large that it recognizes fabricated evidence and identity theft simply because that evidence was later presented as part of a judicial proceeding. The answer to that question is no, because identity theft and fabricated evidence have no place in litigation, and that's why the litigation privilege doesn't apply. At the outset, I'd like to distinguish between the causes of action in this case, because they are in two different worlds. On the one hand, we have the common law causes of action. This is principally the intentional economic interference claim. Now, there's no question that the litigation privilege could apply to that sort of claim. The argument here is simply that it doesn't because Utah has a bad faith and fraud exception. Now, the other cause of action is where I'd like to start, and that's the cause of action for identity theft, and it's in a totally different world. For one thing, it's statutory rather than common law, but much more importantly, the elements of that cause of action all took place completely outside the litigation. Now, as you know from the brief- Is bad faith and fraud exception in Utah law? What case are you citing? This is Moss v. Parwatops. It's decided by the Utah Supreme Court in 2012, and while it doesn't control because it applies only to attorney conduct, it is the closest case that we have, and it's- But they didn't say there was an exception. They said those actions aren't a separate cause, that the court who's trying the case can issue sanctions to take care of that bad conduct. Isn't that what Moss says? Well, yes and no, Your Honor. Moss carves out an exception, and the specific language of the Moss court is in paragraph 37, where an attorney has committed fraud or otherwise acted in bad faith, the privilege will not shield an attorney from civil liability. Now, to your point about Rule 11 and professional conduct, the court uses those as justifications for this very broad privilege. The court says, look, we're going to extend the privilege from statements to conduct, and we recognize that this is a big step, and we don't think it's going to be that much of a problem because of these Rule 11 discovery sanctions, so on and so forth. Well, that paragraph you're looking at, you say it will not shield the attorney, the privilege will not shield an attorney from civil liability, and then the rest of the paragraph, an attorney may be liable for the torts of abuse of process, malicious prosecution, but only if the attorney acted outside of the scope of representing his client or acted for his own interests. Do we have that here? No, Your Honor, we don't because there have been no allegations. How does the exception apply to your case? Well, the exception for Moss doesn't apply directly. This case arose in- You want us to move beyond Moss? Yes, only for purposes of this case, Your Honor. This is a diversity case, and so I think- Should we send this to the Utah Supreme Court and let them tell us what their law is? It's possible that this court could certify the question. I don't think that a certification is necessary here because Moss tells us almost everything we need to know. In paragraph 29 of the opinion, the court lays out its roadmap for what it would do when presented with a new question, like whether to extend the privilege to conduct and not just statements, and in that paragraph, the court says, well, first we look at policy, and then we look at what other jurisdictions have done on this question. And so I think it's fairly easy to use Moss to predict what the Supreme Court would say in this case. In the Supreme Court, based on the Moss opinion itself, there's no reason to protect party conduct more than attorneys' conduct, and that's principally because there are more options to remedy an attorney's misconduct than there are parties. Rule 11 doesn't apply in the same way. There's no professional code of conduct that applies to parties. And so based on what the Moss court says, it's fairly- the court would extend the same exception for bad faith and fraud to parties that it's already extended to attorneys. Now, we've got two lawsuits, right? You've got XPO sued Peterson, and then Peterson sued XPO. That's correct, Your Honor. And we're here on Peterson v. XPO. Is the first case still pending? It is, Your Honor. I'm not involved- So can't the district court take care of these bad acts in that case? No, Your Honor, and here's why. The harm that Mr. Peterson suffered was that he got fired from his job at Leeway, which is XPO's competitor. Now, getting fired had nothing to do with the underlying litigation. If the harm had been simply some bad effect in the underlying litigation, then I think absolutely, Your Honor, is correct. The best remedy, the point closest in time, and the judge most familiar with the facts is going to be in that underlying action. But here, there's absolutely no discovery sanction, Rule 11, or anything else that can make Mr. Peterson whole. Even dismissal of the case outright against him isn't sufficient. Now, Your Honors, I'd like to turn back to the identity theft cause. And as you know from the briefing, the Utah Code creates a civil liability that's predicated on the criminal identity fraud statute. So to be guilty of identity fraud under Utah law, a person needs to have information of another with fraudulent intent. And so the allegations in this case are that XPO, someone at XPO, sat down at their computer. They used Aaron Peterson's email address. They used his signature, and they created content for two emails that made it look like Mr. Peterson was soliciting clients from XPO, which, if true, would have been in violation of his contractual employment agreement with XPO. And at that point, this was outside the litigation. The crime was complete, and the cause of action accrued. The reason that- Do we know who did this even yet? Your Honor, the record doesn't say who did this. We believe that- Well, if it's not in the record, we can't believe either. That's right. We think we know, but we need discovery to find out. And so we didn't allege. These are serious allegations. We're not going to name people without having more information. Now, this is the mistake that the district court made in this instance. It said, look, the identity theft was then presented in court, and that's where the damage was, so the litigation privilege must apply. But the cause of action accrued before there was ever presentation of that information. And of course, we know that the law doesn't allow parties or attorneys to launder bad acts through the judicial process. And that's what the district court allowed here. And this isn't even an issue that rises under Moss. This is simply the elements of the crime, which constitute a civil cause of action. When they accrued, they accrued without any relationship to the litigation. And so this court should reverse on that point. Let me just ask you a follow-up on that. So your position is, at least with regard to identity theft, the application of the privilege here was just erroneous, regardless of what Utah says about the privilege. That's correct, Your Honor. That's the point. The idea—well, let me use an example to explain this. We all know that in the attorney-client privilege, which is arguably even stronger than the litigation privilege, I can't take an existing document and hand it to my attorney and make it privileged. That's the laundering that the district court allowed in this case. It said there's been identity theft, but because the identity theft only came to Mr. Peterson's attention through litigation, then the litigation privilege applies. But the cause of action accrued without that presentation. And maybe damages would have been different, certainly. But the statute allows punitive damages, and it allows Mr. Peterson to get to a jury. He could have sued for identity theft, whether or not—regardless of whether XPO ever presented this information. And that's where the district court made its legal error. Okay, but that doesn't—I guess you're conceding that rationale does not apply to the intentional interference claim? That's correct, Your Honor. The common law causes can fall under the privilege, no question about that. The argument here is simply that they don't because of the exception. And this goes back to the earlier conversation about Moss. Now, could this court certify the question? Absolutely. I don't think it's necessary. And I think I've gone over all those—the points I wanted to make, so I'll reserve the rest. Thank you. Thank you. May it please the Court, I'm Robert Smeltzer on behalf of XPO. Could you bring the mic closer to you? There you go. Okay. The facts in this case, Your Honors, are very straightforward. Plaintiff's claims in this case are predicated on two emails that were sent in the underlying litigation. There's no question in this matter that the emails that they allege are forged were sent in the body of a settlement email that was explicitly entitled as such, a protected settlement communication under Federal Rule of Evidence 408, from XPO's counsel, me, to Leeway's counsel in the case. The Court can consider the actual transmittal email because it was— on the transmittal of the forged emails, not their creation. And that makes sense because if there was fabricated evidence, if there were emails that were created and just sitting there and never used, there would be obviously no cause of action. So it's important to note that all of Plaintiff's claims in this matter are predicated on the publication of the emails and the means by which those emails were published were a settlement email from counsel to counsel. Now, the emails— Were these emails taken as evidence by the District Court? No. They were never presented to the District Court. They were never used as the basis for a motion for a leave to amend the complaint. I ask that because Moss and other cases talk about our use of this privilege and to be protective of what happens in judicial proceedings. But if these emails never saw the light of day in the judicial proceeding, that is before the Court, how can the Court sanction or do anything to correct this wrong? Well, they were presented in the course of the litigation, and the privilege applies to anything that happens in the course of the litigation. Right, but part of the argument about the privilege is we don't need to deal with that in a second piece of litigation because the first litigation will take care of it because the District Court can sanction bad acts by attorneys. And that's all good and well. But here, the District Court wouldn't have known about it. Well, in fact, the District Court did know about it because discovery was done on it in the underlying action. Defendants in the underlying action raised the issue to the Court and actually did discovery via subpoena on it. So there was a mechanism that the defendants could have or did raise the issue in the District Court. And if the District Court had chosen or found, based on any evidence, that there was a forgery of these emails and it was attempted to be used... Well, but that's a reach. I mean, most District Courts have enough to do without worrying about things that aren't even admitted into evidence. I mean, if you're going to get into the weeds of discovery battles, the District Court would have its hands full. Well, it's plaintiff in this case that is alleging harm from the use of them in the litigation. Correct. Correct. But you understand my point. Yes, I do. So what is the relief for Mr. Peterson? He's just without a job? Tough? Right now, and ironically, that was the whole point of the enforcement of the restrictive covenant litigation in the first place, that he couldn't work for his new employer, Leeway. So he got what was coming to him? Well, no, I'm just saying that this wasn't some ulterior motive. It was the very motive of the lawsuit in the first place. Well, he was working for a second company, wasn't he? Yes, he was working for Leeway. Correct. And these emails caused him to lose that job. Yeah, that's what the allegation is. Well, wouldn't we know that for certain? They saw the emails and he was fired. Well, I don't think we know that for certain, because I've done hundreds of restrictive covenant cases, and a lot of times the new employer will choose to terminate an employee on their own accord, without any sort of evidence like this, because they just decided that the new employee isn't worth the cost and expense of defending the enforcement of the restrictive covenant action. So we don't know that. In fact, what we know from the record is that when Leeway's counsel, the new employer's counsel, was presented with this information, he immediately questioned the provenance of the email, raised doubts about them, asked XPO's counsel, myself, to a lot of questions about, can we have the original? These seem to be erroneous. And once that happened, once that happened, they were never referenced or used again as the basis of settlement in court or anything else. So the record, which, again, plaintiff's claims, Mr. Peterson's claims, are predicated on the transmittal email. The transmittal emails show that there was a doubt from the very beginning of the provenance of the emails. So it doesn't really follow, although that's the allegation. There's a real tunely, I think, question about whether that claim is plausible. That is the claim that Leeway acted directly in reliance on these so-called forged emails to terminate someone when Leeway's counsel immediately raised questions about their provenance. Mr. Peterson also alleges that XPO created these emails, even though after a year of discovery in the underlying action, they've been able to come up with no specific facts in that regard. There's no allegation in the complaint who created the emails or when. So really what we have in the complaint is another bold conclusion. It's not specific facts, and it raises another tunely issue, whether this claim is plausible in the first instance. In any event, the complaint- Who else would care? Excuse me? Who else would care? I don't know, Your Honor. Yeah, I don't either. So I don't know how tunely it fits into this. But the complaint also concedes that the email was published only once, by counsel to counsel, and clearly that kind of a communication falls within the scope of Utah's very broad and expansive judicial proceedings privilege. It applies to all stages, whether it's settlement or otherwise. It doesn't have to be used. There's no question, there's been no argument below on our motion to dismiss or in the appellate brief that XPO hasn't met all three elements of the privilege. I think the argument is that that is true, as we know the privilege today, but this takes it a bit too far, I think, is the argument of Mr. Peterson, because you're talking about fraud. And I think the suggestion that the Moss case has recognized this broad exception for any kind of bad faith or fraud is just, it's wrong. Ironically, Moss actually expanded the scope of the judicial proceedings privilege in Utah by applying it for the first time to conduct. If you read Moss all throughout the opinion, the court reaffirms and confirms the broad scope of the privilege, calling it absolute, calling it extraordinary in scope, and yet Planoff relies on it to create an exception that would really, it would obliterate the whole entire privilege in the first place. And it simply can't be, it doesn't stand for that proposition. As Your Honor, as Judge Briscoe indicated earlier, I think what ultimately what Moss is saying, that the privilege only doesn't apply to attorney conduct if the attorney is acting for their own interests and not in their client's best interest. That is not really an exception to this broad, expansive privilege that Moss itself expands and reaffirms. Really, it's more speaking to the second element of the privilege. Did these acts complained of really occur during the course of or related to a judicial proceeding? Well, in the point of Moss, again, is that we shouldn't be creating second and third and fourth tiers of litigation on these kinds of issues because the district court handling the first case can handle the matter through sanctions. How is that possible here? Again, Your Honor, as I said earlier, the litigants below, the defendants below, did raise this issue, pursued discovery on it. If they raised the issue, pursued discovery, then certainly they could continue at least to try to get some remedy for the alleged misconduct. Have they sought sanctions at this point? No, they hadn't. Would the sanctions that they would obtain through that litigation, would that make Mr. Peterson whole? Not for the particular loss of his job, if you assumed that there was some causal relationship between these e-mails, notwithstanding Leeway's counsel's explicit questions. What's our closest case to uphold the district court here? Well, I think it would probably be, I think Moss is a good case because of how it reaffirms how broad the privilege really is and how it talks about the policies really behind it, not forcing or avoiding a multiplicity of litigation and really the policy. Here we have the unique problem of damages that are really beyond the scope of the first litigation. That is the loss of employment. Yes. That's not an issue in your first case, is it? No, but the policy behind the privilege still applies to this case. The policy is for free and open expression during judicial proceedings because the court can only perform its function and the parties can only advocate and take their various positions if they're free to express different ideas without fear of subsequent civil liability. If we were to hold otherwise, we'd really be in a situation where every lawsuit could spawn related lawsuits based on what happened in the litigation. So the principle that we're trying to further here is open and free expression without fear of civil liability. That's what we've got here. If I knew that there was going to be a danger of civil liability by forwarding information that I in good faith thought was relevant to the case and forwarded it in a settlement email, those settlement discussions would never have occurred. Part of the privilege is to, or the recognition of the privilege, it actually promotes settlement of disputes if people, if litigants. But maybe when you're publishing matters and exchanging information, you should be very certain that what you're circulating is accurate. Well, in the course of a judicial proceeding, we're advocating. You can't make stuff up, though, usually. That sort of goes beyond the pale. But there's all sorts of instances in litigation where a party can look at the same thing and say that it promotes their point of view or it doesn't. Every single lawsuit involves credibility determinations, for instance. So if you prove that as any case where somebody's credibility is impeached or undermined or suggests that it may be false, is that going to spawn another lawsuit? It just makes no sense. And that's why it's been applied so. It's been applied to every single tort that you can think of. Intentional interference with prospective economic advantage. Defamation. Intentional infliction of emotional distress. Abusive process. Civil conspiracy. Can you address his identity theft argument? No, it hasn't been applied yet. But it has been applied to fraud claims. In fact, the Klein v. DCFS case that was originally cited by Mr. Peterson in his brief, that case held that a fraud claim for perjured testimony in a lawsuit was in fact barred by the privilege. And it even went further, and this is relevant to Mr. Peterson's fabrication of evidence, even though it wasn't used in the evidence. The Klein case went even further and said, even fabrication of a fraud claim premised on fabrication of evidence during the course of an investigation would have been privileged if the investigation was an integral part of the judicial process. So even there you have it explicitly applied to a fraud claim and in more vindicta said it would have been applied to a fabrication of evidence claim if. You're over time. Okay. Did you have further questions? No, that's answered my question. Thank you. Thank you. Thank you. John Robinson again for the appellant, Aaron Peterson. Three points, Your Honors, possibly four. First, as to Judge Briscoe's point, I think I touched on this in my first time at the lectern, but her point that there is no remedy in the underlying litigation that can make Mr. Peterson whole is exactly right. Mr. Smeltzer couldn't offer anything that a discovery sanction or anything else would do to make Peterson whole as to being fired, and that ties into the procedural posture. Now, it's possible that on remand we could fail in this case on a failure of proof for some of the reasons that Mr. Smeltzer pointed out, but we have alleged that he was fired and on review on this procedural posture that's assumed to be true. Now, number two, opposing counsel focuses on the publication, and that makes a lot of sense because the publication is the most likely place for him to find support in the law. I would like to point the Court to a Ninth Circuit opinion, which was applying California law, so it's certainly not binding and is persuasive only to the extent that the Utah Supreme Court would follow it, but this is Payne v. City of Lompoc. And if that's in your brief? It's actually in his brief, Your Honor. Okay. And in that case, it involved police officers that did two things. They covered up evidence and then they lied about it on the stand. What the Ninth Circuit said was that the perjury was immune under the litigation privilege, but then turning to the predicate acts, the Ninth Circuit said, allowing witnesses to so launder their non-testimonial activities through their testimony would transform the immunity from a shield ellipsis into a sword. And that's what we have here. Focusing on the publication of the e-mails in the judicial process is no way, as the Payne Court points out, to excuse the conduct that led to the ability to publish those e-mails. Now, third, complete agreement about what the policy behind the litigation privilege is. The issue is whether or not that policy is supported or undermined by the result that the district court reached here, and I submit that it's actually undermined. Excusing fraudulent evidence and identity theft in this way undermines the whole idea of coming into the court and seeking truth. And finally, as to the Klein case, Klein isn't very useful here for several reasons. First, because it was the Utah Court of Appeals, not the Supreme Court. Second, because it was decided in 2007, not 2012, so it's a lower court and it predates Moss. And also, the nuances of that case are slightly different in that the lie on the stand, the perjury, was absolutely immune, but it was only qualified immunity for the activity that led to the perjury. And the court found that there was a pleading problem with the qualified immunity, so it did immunize her, but not the perjurer, but not because it was strictly immune, but because the complaint hadn't pled sufficient facts to get there. And with that, Your Honors, I urge the court to reverse on everything, but if the court disagrees with me on the common law, certainly the identity theft is reversed in this case. Thank you very much. Thank you. Thank you, counsel. Thank you both for your arguments this morning.